IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| NEBRASKA FURNITURE MART, INC., <br><br> Plaintiff, <br><br> vs. <br><br> GUARDSMAN US LLC, <br><br> Defendant. | 8:21-CV-192 <br><br> MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |

## I. INTRODUCTION

Nebraska Furniture Mart, Inc., (NFM) has sued Guardsman US LLC, (Guardsman) claiming that Guardsman owes it money under a "Retailer Agreement." In the alternative, NFM seeks application of the doctrines of equitable estoppel and promissory estoppel to require Guardsman to pay the money NFM believes it is owed. Both parties have moved for summary judgment. Filing 24; Filing 27. For the reasons stated herein, the Court grants Guardsman's Motion and denies NFM's Motion.

## II. BACKGROUND

NFM is a Nebraska corporation that operates a large furniture store in Omaha, Nebraska and has expanded to operate stores in several cities in the Midwest and Texas. Filing 25 at 3.[1] Along with selling furniture, NFM partners with a third-party vendor to offer customers protection plans for accidental stains and damage. Filing 25 at 3. Up until December 31, 2020, NFM's third-party vendor for furniture protection plans was Guardsman, a Delaware limited liability company. Filing 25 at 3.

---

[1] The parties provided a list of stipulated facts with their Briefs supporting their Motions for Summary Judgment, from which the Court draws its statement of facts unless it can rely on evidence in the record.

1

On November 15, 2018, NFM and Guardsman entered into a "Retailer Agreement." Filing 26-1 at 1–5. The Retailer Agreement provided for a term from November 15, 2018, to December 31, 2020; mandated that NFM would only offer Guardsman protection plans; and outlined the terms under which NFM would sell Guardsman protection plans to customers and how Guardsman would handle claims. Filing 26-1 at 1–5. The Retailer Agreement also contained a survival clause providing, "Each term of this Agreement which expressly survives expiration or termination of this Agreement, or otherwise where the context reasonably requires, shall survive expiration or termination of this Agreement." Filing 26-1 at 5. The Retailer Agreement further stated that it could only be amended by a written agreement signed by both parties. Filing 26-1 at 5. Contemporaneous with the Retailer Agreement, both parties executed a "POS Addendum," which states that it is part of the Retailer Agreement. Filing 26-1 at 9.

This suit arises from a dispute over a section in the Retailer Agreement titled "Trade Program," which states in full:

> **Guardsman offers an annual Trade Program in the amount of 5% of the cost of plans purchased by the Retailer [(NFM)].** The percentage amount is based on continuing sales in all categories (fabric, leather, hard surface case goods, area rugs, outdoor furniture, Gold, window treatment, carpet, adjustable bed and furniture care products). The Trade Program is subject to change if NFM changes vendors in any of the protection categories. **The trade program dollars are to be re-invested in the Guardsman protection program to help increase the overall close ratio performance of the program. The Trade Program is paid annually and will not be issued if Retailer has a past due balance.** Trade programs are subject to reevaluation on an annual (calendar year) basis and in the event any changes are made to the Trade Program, Guardsman agrees to provide retailer with notice detailing the proposed change(s) at least 30 days in advance of any change going into effect. In the event of a change to the Trade Program, within 20 days after Retailer Receiving notice of a change, Retailer may terminate this Agreement without penalty. If retailer Terminates this agreement subject to this section, the Agreement shall terminate in 90 days post Retailers [sic] election to terminate.

Filing 26-1 at 8 (emphasis added). Pursuant to the trade program governed by the above section, in January of 2020, Guardsman paid NFM five percent of the net sales of its protection plans

purchased by NFM's customers in 2019 by check, which NFM used to fund incentives to its employees to encourage them to sell more Guardsman protection plans in 2020. Filing 25 at 6. After the expiration of the Retailer Agreement on January 1, 2021, NFM discontinued selling Guardsman protection plans, causing Guardsman to refuse to pay NFM five percent of the net sales of its protection plans made in 2020. Filing 25 at 3–6. This dispute concerns whether Guardsman must pay five percent of the net sales of its protection plans made in 2020 to NFM, which the parties agree equals $330,971.16. Filing 25 at 6.

During the term of the Retailer Agreement, Guardsman's Vice President of Sales, Kerry Lawless, signed two documents on Guardsman's behalf. On March 29, 2019, Lawless signed a "Vendor Participation Agreement," which was effective from January 1, 2019, to December 31, 2019. Filing 26-3 at 1. The Vendor Participation Agreement is printed on NFM letterhead and states that Guardsman will give NFM "Anniversary Support" in the amount of $110,000 to be paid quarterly in $27,500 increments and a "Volume Rebate" in the amount of a "5% rebate based on net receiving." Filing 26-3 at 1. According to NFM, the rebate delineated in the Vendor Participation Agreement refers to the five percent reimbursement provided in the "Trade Program" section of the Retailer Agreement and required Guardsman to pay an unconditional rebate to NFM. Filing 28 at 8, 18. Guardsman disputes the relevancy of the Vendor Participation Agreement because it is not an enforceable amendment or modification to the Retailer Agreement and is separate from the "Trade Program." Filing 32 at 3, 10.

Additionally, on March 19, 2020, Lawless signed a document titled "Funding Program," which has an effective date from January 1, 2020, to December 31, 2020. Filing 26-2 at 1–2. Similar to the Vendor Participation Agreement, the Funding Program document is printed on NFM letterhead and states that Guardsman will provide NFM with "Anniversary Support" in the amount

3

of $125,000, to be paid quarterly in $31,250 increments, and a "Rebate Amount" of "5%." Filing 26-2 at 1. Directly above the signature line, the Funding Program document states, "By signing this form, you confirm that all information stated above is accurate and will be upheld via the Vendor Master Agreement." Filing 26-2 at 2. NFM argues that the Funding Program document "confirmed" Guardsman's obligation to pay the five percent of the net sales of Guardsman protection plans to NFM as an unconditional "rebate" for the year 2020. Filing 28 at 7, 14–16. Guardsman disputes the relevancy of the Funding Program document because it is not an enforceable agreement and did not amend the Retailer Agreement. Filing 32 at 1–2, 9–14.

On May 17, 2021, NFM filed suit against Guardsman, claiming that Guardsman breached the Retailer Agreement by refusing to pay NFM five percent of the net sales of the Guardsman protection plans for 2020. Filing 1. NFM also states in its Complaint that, by signing the Vendor Participation Agreement and the Funding Program document, Guardsman is equitably estopped from denying that the payment under the Trade Program is an unconditional rebate that must be paid to NFM. Filing 1 at 6–7. Alternatively, NFM also alleges that the doctrine of promissory estoppel, in conjunction with Guardsman signing the Vendor Participation Agreement and the Funding Program document, requires Guardsman to pay NFM five percent of the net sales of the Guardsman protection plans for 2020. Filing 1 at 7–8. On March 25, 2022, both parties cross-moved for summary judgment. Filing 24; Filing 27.

### III. ANALYSIS

#### A. Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. (a). "'Only disputes over facts

that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'" *Rusness v. Becker Cnty.*, 31 F.4th 606, 614 (8th Cir. 2022) (quoting *Doe v. Dardanelle Sch. Dist.*, 928 F.3d 722, 725 (8th Cir. 2019), in turn quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "The moving party bears the burden of showing the absence of a genuine dispute." *Glover v. Bostrom*, 31 F.4th 601, 603 (8th Cir.) (citing Fed. R. Civ. P. 56(a)), *reh'g denied*, No. 20-2884, 2022 WL 1564097 (8th Cir. May 18, 2022). The party opposing summary judgment must "cit[e] particular materials in the record" or show that the "materials cited do not establish the ... absence of a genuine dispute." Fed. R. Civ. P. 56(c)(1). On a motion for summary judgment, "a district court should 'not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue.'" *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (quoting *Great Plains Real Est. Dev., L.L.C. v. Union Cent. Life Ins.*, 536 F.3d 939, 943-44 (8th Cir. 2008)). Instead, the court must view the evidence in the light most favorable to the non-moving party and afford that party all reasonable inferences supported by the evidence. *Grinnell Mut. Reinsurance Co. v. Dingmann Bros. Constr. of Richmond, Inc.*, 34 F.4th 649, 652 (8th Cir. 2022); *Pearson v. Logan Univ.*, 937 F.3d 1119, 1124 (8th Cir. 2019). "The Supreme Court's 'repeated' admonition is that 'the plaintiff, to survive the defendant's [summary judgment] motion, need only present evidence from which a jury might return a verdict in his favor.'" *Doe by next friend Rothert v. Chapman*, 30 F.4th 766, 772 (8th Cir. 2022) (quoting *Anderson*, 477 U.S. at 257).

### B.  Choice of Law

Before the Court can address the parties' arguments in support of their Motions for Summary Judgment on NFM's breach-of-contract claim, it must first determine which states' substantive law governs this dispute. Throughout its Brief in Support of its Motion for Summary

Judgment, NFM cites a mixture of Nebraska and Delaware law. Filing 28. In contrast, Guardsman notes that the Retailer Agreement includes a choice-of-law provision stating that Delaware law governs, exclusively cites Delaware law when arguing about substantive issues, and faults NFM for relying on Nebraska law. Filing 32. Because the parties dispute which state's substantive law applies, the Court must undertake a choice-of-law analysis. *Cf. BBSerCo, Inc. v. Metrix Co.*, 324 F.3d 955, 960 n.3 (8th Cir. 2003) (noting that when neither party raised a conflict-of-law issue, the forum state's substantive law applies by default). *But see Fredericks Peebles & Morgan LLP v. Assam*, 915 N.W.2d 770, 780 (Neb. 2018) ("In answering any choice-of-law question, a court first asks whether there is any real conflict between the laws of the states.").

"A district court sitting in diversity jurisdiction applies the conflict of law rules for the state in which it sits." *DCS Sanitation Mgmt., Inc. v. Castillo*, 435 F.3d 892, 895 (8th Cir. 2006). "In deciding choice-of-law questions, Nebraska follows the Restatement (Second) of Conflict of Laws (Restatement)." *Id.*; *accord In re Est. of Greb*, 848 N.W.2d 611, 622 (Neb. 2014) ("For the resolution of conflict of laws involving contracts, this court has adopted the Restatement (Second) of Conflict of Laws § 188.28."); *Am. Nat. Bank v. Medved*, 801 N.W.2d 230, 237 (Neb. 2011) (adopting § 187 of the Restatement (Second) of Conflict of Laws). Generally, Nebraska courts honor choice-of-law provisions in contracts. *See Castillo*, 435 F.3d at 895; *Medved*, 801 N.W.2d at 236 ("We have recognized that persons residing in different states may select the law of either state to govern their contract and that the parties' choice of law will govern.").

Here, the Retailer Agreement has a choice-of-law provision stating that Delaware law governs. Filing 26-1 at 4. Therefore, Delaware law will apply "if the particular issue is one which the parties could have resolved by an explicit provision in their agreement directed to that issue." *Medved*, 801 N.W.2d at 236 (quoting Restatement (Second) of Conflict of Laws § 187(1) (1971)).

There is no indication that the issues in this case could not have been resolved by an explicit provision in the Retailer Agreement. The parties are asking the Court to apply general principles of contract law to determine whether a provision in the Retailer Agreement requires Guardsman to pay money to NFM. Accordingly, the Court will enforce the choice-of-law provision in the Retailer Agreement and apply Delaware law to resolve NFM's breach-of-contract claim.

### C. Contract Interpretation

Have dispensed with the preliminary issue of which law applies in this case, the Court turns to the "Trade Program" section of the Retailer Agreement to determine whether it requires Guardsman to pay five percent of the net sales of its protection plans for 2020 to NFM. Both parties argue that the unambiguous terms of the "Trade Program" section clearly support their respective positions. The Court therefore turns to whether there is any ambiguity in the terms within the "Trade Program" section and, if not, the meaning of the section's plain terms.

Contract interpretation is a matter of law. *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1266–67 (Del. 2017). The objective of contract interpretation is to determine "the intent of the parties from the language of the contract." *Cox Commc'ns, Inc. v. T-Mobile US, Inc.,* 273 A.3d 752, 754 (Del. 2022), *reargument denied* (Mar. 22, 2022). To that end, courts must decide what "an objective, reasonable third party" would understand a contract to mean. *Id.* "The Court must 'interpret clear and unambiguous terms according to their ordinary meaning,' and in an 'unambiguous, integrated written contract,' the Court may not use extrinsic evidence to 'vary[ ] or contradict[ ] the terms of that contract.'" *Bathla v. 913 Mkt., LLC*, 200 A.3d 754, 759–60 (Del. 2018) (internal footnotes omitted) (alterations in original) (first quoting *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012) and then quoting *Galantino v. Baffone*, 46 A.3d 1076, 1081 (Del. 2012)). A court may only consider

extrinsic evidence when a contract is ambiguous. *Cox Commc'ns*, 273 A.3d at 754. "The test for ambiguity is whether "the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings." *Bathla*, 200 A.3d at 760. Ambiguity does not arise simply because each party supplies different interpretations to a contract, *id.*, unless each party's interpretation is objectively reasonable. *See GMG Cap. Invs.*, 36 A.3d at 781 (holding that because both parties offered reasonable interpretations, the agreement was ambiguous).

Delaware courts use several guidelines when engaging in contract interpretation. First, courts must "construe the agreement as a whole, giving effect to all provisions therein." *Id.* (quoting *E.I. du Pont de Nemours & Co. v. Shell Oil Co.*, 498 A.2d 1108, 1113 (Del. 1985)). Second, a court should read a contract in a way the does not render any part of the contract illusory, meaningless, or mere surplusage. *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 575 (Del. 2019) (holding that contract interpretation should not make any provision "illusory or meaningless"); *Kuhn Const., Inc. v. Diamond State Port Corp.*, 990 A.2d 393, 396–97 (Del. 2010) (holding that contract interpretation should not make any part of the contract "mere surplusage"). Finally, when an interpretation "produces an absurd result or one that no reasonable person would have accepted when entering the contract," the interpretation is unreasonable. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010).

Both NFM and Guardsman agree that the "Trade Program" section is expressed in unambiguous terms but attach two different interpretations to it. NFM focuses on the part of the "Trade Program" section which states, "The Trade Program is paid annually." Filing 26-1 at 8; Filing 28 at 12. NFM emphasizes that nothing in the section says that the Trade Program funds will not be paid for the last year of the Retailer Agreement, *i.e.*, 2020, and thus it requires Guardsman to pay NFM five percent of the net sale of the protection plans for 2020. Filing 28 at

8

12. Although recognizing that the section also provides that the Trade Program funds "are to be re-invested in the Guardsman protection program to help increase" the sale of Guardsman protection plans, NFM argues that this reinvestment requirement did not survive the expiration of the Retailer Agreement. Filing 28 at 13. Instead, NFM looks to the Retailer Agreement's survival clause, which provides that a term of the Retailer Agreement will survive expiration of the Retailer Agreement when the "context reasonably requires." Filing 26-1 at 5. According to NFM, application of the survival clause means that Guardsman's obligation to pay the Trade Program funds survived the expiration of the Retailer Agreement because that payment could only be calculated after the Retailer Agreement ended, while NFM's reinvestment obligation did not survive because there was no longer any Guardsman protection program in which to invest. Filing 28 at 13–14. In other words, NFM believes that the "context reasonably requires" that the part of the "Trade Program" compelling Guardsman to pay five percent of the net sales of Guardsman protection plans to NFM survived while NFM's corresponding obligation to reinvest those funds did not. Filing 28 at 13–14.

Naturally, Guardsman disagrees with NFM that the "Trade Program" section contemplates paying NFM without requiring NFM to reinvest that payment into the Guardsman protection program. Rather, Guardsman contends that the language of the section shows an intent to promote the sale of more protection plans by providing NFM funds to encourage NFM employees to sell protection plans, not to provide NFM with a commission or an unconditional rebate. Filing 25 at 13. According to Guardsman, when the Retailer Agreement ended on December 31, 2020, the "Trade Program" ended along with it. Filing 32 at 6. Thus, while NFM parses out parts of the "Trade Program" section, arguing that some survive and others do not, Guardsman contends that the "Trade Program" section wholly survives or wholly ends.

The Court begins by observing that the "Trade Program" section governs an annual program. The section states that Guardsman offers an "annual" program that is subject to change "on an annual (calendar year) basis" and paid "annually." Filing 26-1 at 8. Looking at how the program operates each year, the section explains that Guardsman offers "5% of the cost of the plans purchased by the Retailer," which, apparently, means five percent of the net sales of the protection plans to NFM customers.[2] Filing 26-1 at 8. The section goes on to say that the "trade program dollars are to be reinvested in the Guardsman protection program to help increase the overall close ratio performance of the program." Filing 26-1 at 8. Put more simply, this provision, stated in mandatory and not permissive terms, requires NFM to reinvest the five percent of the net sales paid by Guardsman to increase the number of Guardsman protection plans sold to NFM customers. Reading these terms together, the "Trade Program" section governs an annual program through which Guardsman would pay NFM five percent of the previous year's net sales of Guardsman protection plans to be used to increase the number of protection plans sold in the future.

The fact that the "Trade Program" section governs an annual program designed to boost the sale of protection plans informs the result in this case. As part of an annual program, the obligation to pay and the requirement to reinvest arise yearly; they are not separate from one another. Instead, both parties' obligations are tied together. The section dictates that, each year, Guardsman would calculate and pay five percent of the previous years' net sales to NFM to be used by NFM to increase future sales. However, when the Retailer Agreement ended after December 31, 2020, the Trade Program also terminated. There simply was no Trade Program for

---

[2] Because there is no dispute over what constitutes "5% of the cost of the plans purchased by the Retailer"—both parties have stipulated that it means the net sales of the protection plans sold to NFM customers—the fact that this provision does not clearly state that the payment is calculated at five percent of the net sales of the protection plans to NFM customers has no bearing on the Court's analysis.

2021 that required Guardsman to make a payment for NFM to reinvest. Thus, when the Retailer Agreement expired, Guardsman's obligation to pay expired as well.

NFM believes it can sidestep this result by relying on the Retailer Agreement's survival clause. NFM is mistaken. The survival clause allows terms of the Retailer Agreement to survive termination of the Retailer Agreement when "the context reasonably requires." NFM argues that because Guardsman could not pay the Trade Program funds for the 2020 sales until 2021, when the net sales for 2020 could be calculated, the context reasonably requires that Guardsman's obligation to pay survives the expiration of the Retailer Agreement. NFM further asserts that its obligation to reinvest did not survive, because the context shows that it could not reinvest to boost the sale of protection plans it was no longer selling. This argument misses the mark. Because the only reasonable construction of the "Trade Program" provision shows that the obligation to pay and the obligation to reinvest are tied together, the issue is not whether one obligation can survive while the other does not. The issue is whether the Trade Program as a whole survives. It does not. After December 31, 2020, the Trade Program ended along with the Retailer Agreement.

As Guardsman correctly notes, there is no indication in the terms of the "Trade Program" section that Guardsman intended to reward NFM for selling Guardsman protection plans without any strings attached. To argue otherwise would impose an unreasonable reading on the "Trade Program" section. *See Cox Commc'ns*, 273 A.3d at 754 (noting that contract interpretation asks what "an objective, reasonable third party" would understand a contract to mean). The section does not allow NFM to enjoy the benefit of the funds without the burden of reinvestment. Instead, the funds are paid yearly so that NFM can boost the sale of Guardsman's protection plans. When the Retailer Agreement expired at the end of 2020, Guardsman's obligation to pay NFM for the Trade Program in 2021 also expired. Accordingly, as a matter of law, the plain meaning of the

unambiguous terms of the "Trade Program" section provides that the Trade Program, along with Guardsman's obligation to pay the Trade program funds to NFM, ended when the Retailer Agreement expired. *See Osborn*, 991 A.2d at 1159–60 ("When the contract is clear and unambiguous, [the court] will give effect to the plain-meaning of the contract's terms and provisions."). Therefore, the Court concludes that the section does not require Guardsman to pay five percent of the net sales of Guardsman protection plans for the 2020 year.

### D. The Vendor Participation Agreement and the Funding Program Document

Having concluded that the unambiguous terms of the "Trade Program" section do not require Guardsman to pay NFM, the Court turns to NFM's other arguments. NFM first argues that the Vendor Participation Agreement provided a five percent rebate to NFM in 2019 and therefore "confirms" that the "Trade Program" section obligates Guardsman to pay five percent of the net sales of its protection plans for 2020. Filing 30 at 21–22. However, extrinsic evidence, such as the Vendor Participation Agreement, cannot be considered by the Court to alter the "Trade Program" section's plain and unambiguous meaning. *Exelon Generation Acquisitions, LLC v. Deere & Co.*, 176 A.3d 1262, 1267 (Del. 2017) ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract, or to create an ambiguity."). As this Court has already concluded, the "Trade Program" section is unambiguous, and the plain meaning of its terms does not require Guardsman to pay five percent of the net sales of its plans from 2020 to NFM.

Finally, NFM argues that the "Funding Program" document is an agreement that separately requires Guardsman to pay five percent of the net sales of its plan from 2020 to NFM. Filing 28 at 14–18; Filing 30 at 9–15. According to NFM, the "Funding Program" document is an amendment to the Retailer Agreement in which the parties agreed that the Trade Program funds would be paid

12

as a "rebate." NFM emphasizes that Black's Law Dictionary defines "rebate" as "[a] return of part of a payment, serving as a discount or reduction." Filing 28 at 15 (citing Rebate, Black's Law Dictionary (11th ed. 2019)). Therefore, NFM contends, the "Funding Program" document amended the "Trade Program" section of the Retailer Agreement to turn the Trade Program funds paid by Guardsman into a rebate and to eliminate NFM's corresponding obligation to reinvest the funds to promote the future sale of Guardsman protection plans. The Court disagrees.

The "Funding Program" document is sparse. It consists of a little more than two pages, a large portion of which is blank. Filing 26-2 at 1. The document bears NFM's letterhead at the top and refers to itself as an "agreement," although its appearance is more like a form used to collect information. After listing "Guardsman" as the "Vendor Name" in a section titled "Contact Information"—which contains no contact information—the document provides for "Payment Terms" of "8.75%/45 Days ACH." Below "Section 3" and "Section 4," which are blank and marked as inapplicable, is a section titled "Volume-Based Funds." Within that section, which says that the funds are based on "Net Receipts" and that the "Method of Payment" is "Check," is a heading titled "Rebate Amount." Underneath the "Rebate Amount" heading, the "Funding Program" document simply states "5%." The last section of the "Funding Program" document states, "By signing this form, you confirm that all information stated above is accurate and will be upheld via the Vendor Master Agreement." Filing 26-2 at 2. Guardsman's agent's signature then follows.

The Court concludes that the "Funding Program" document did not amend the "Trade Program" section of the Retailer Agreement as NFM argues. Nothing in this document shows that NFM and Guardsman intended to amend the "Trade Program" section of the Retailer Agreement. *Cox Commc'ns*, 273 A.3d at 754 ("The objective of contract interpretation is to determine 'the

13

intent of the parties from the language of the contract.'" (quoting *Exelon*, 176 A.3d at 1267)). Indeed, neither the Retailer Agreement nor the Trade Program appear by name anywhere in the "Funding Program" document. If the parties intended to amend an agreement, surely they could have included the name of the agreement and the provision they wanted to amend in the amendment. Instead, the "Funding Program" document states that the "information" in "this form" "will be upheld via the Vendor Master Agreement." Filing 26-2 at 2. Thus, the document contemplates enforcement via a separate agreement—what the document calls a "Vendor Master Agreement"—rather than on its own terms. It therefore appears to be little more than a form used to collect and verify information.

NFM's focus on the "Funding Program" listing the "Rebate Amount" as "5%" is unavailing. Again, this part of the document provides no indication that it was meant to amend the "Trade Program" section of the Retailer Agreement. Nor is it of any significance that the word "rebate" is used. NFM points to the definition of "Rebate" in Black's Law Dictionary to argue that it shows that Guardsman intended to provide NFM with a five percent refund based on net sales of protection plans in 2020. Dictionary definitions confirm that a "rebate" is commonly understood as a partial refund of payment.[3] The problem for NFM is that the definition of rebate is not inconsistent with how the Trade Program functioned as outlined in the Retailer Agreement. Guardsman was providing a partial refund to NFM, but also required that the refund be reinvested in promoting future sales of protection plans. Nothing in the various definitions of "rebate" precludes conditioning how a partial refund is to be used by the party receiving the refund.

---

[3] *See* Rebate, Black's Law Dictionary (11th ed. 2019) (defining rebate as "A return of part of a payment, serving as a discount or reduction"); *Rebate*, Merriam-Webster's Unabridged Dictionary, https://unabridged.merriam-webster.com/unabridged/rebate (accessed June 17, 2022) (defining rebate as "a retroactive abatement, credit, discount or refund (as from a wholesaler to a retailer) usually as consideration for a specified volume of business"); *Rebate*, Oxford English Dictionary, (3d ed. 2007), https://www.oed.com/view/Entry/159163?rskey=5w1DKt&result =1&isAdvanced=false#eid (defining rebate as "A deduction from a sum of money to be paid; a discount; *esp.* (in later use) one given retrospectively; a partial refund of money paid").

14

Therefore, the fact that the word rebate is used does not show an intent to amend the "Trade Program" section of the Retailer Agreement to provide NFM with an unconditional partial refund.

Moreover, even if the definition of "rebate" implied that a rebate comes with no strings attached, that would not matter. While it is true that Delaware Courts will look to dictionary definitions to construe terms in an agreement, *see Express Scripts, Inc. v. Bracket Holdings Corp.*, 248 A.3d 824, 834 (Del. 2021) (using dictionary definitions to interpret a contract), dictionary definitions must be read in "the context of the contract language and circumstances." *Lorillard Tobacco Co. v. Am. Legacy Found.*, 903 A.2d 728, 740 (Del. 2006). As the Delaware Supreme Court has warned, "A meaning inferred from a particular provision cannot control the agreement if that inference conflicts with the agreement's overall scheme." *Norton v. K-Sea Transp. Partners L.P.*, 67 A.3d 354, 360 (Del. 2013). Here, the parties agreed in the Retailer Agreement to engage in an annual trade program in which Guardsman paid NFM five percent of the net sales of its protection plans and NFM reinvested the payment to boost the sales of the protection plans in the future. Nothing in the "Funding Program" document shows that it intended to significantly alter that program and change it from a "reimbursement and reinvestment" program into a standard volume-based discount. The Court will not read into the "Funding Program" document an intent to change the Trade Program when it is not reflected by the plain language. *Cf. Murfey v. WHC Ventures, LLC*, 236 A.3d 337, 350 (Del. 2020) (warning that "[i]mplying terms into a written contract should be a cautious enterprise").

As a matter of law, the "Funding Program" document's terms are unambiguous, and their plain meaning does not show any intent to amend the "Trade Program" section of the Retailer Agreement. Guardsman is not required to provide five percent of the net sales of its protection

15

plans in 2020 to NFM. Accordingly, the Court grants Guardsman summary judgment on NFM's breach-of-contract claim.

### E. Equitable Estoppel and Promissory Estoppel

Guardsman also requests that the Court grant it summary judgment on the issues of equitable estoppel and promissory estoppel. Filing 25 at 22–28. NFM makes no argument in response except to say that the "primary thrust" of its Complaint was breach of contract, and because it should prevail on the merits of that claim, it need not address the estoppel issues further. Filing 30 at 22. In fact, NFM characterizes these issues as "duplicative." Filing 30 at 22. The Court grants Guardsman summary judgment on the issues of equitable estoppel and promissory estoppel.

In a diversity case, such as this one, the applicability of equitable estoppel and promissory estoppel is governed by the law of the forum state. *Razorback Concrete Co. v. Dement Const. Co., LLC*, 688 F.3d 346, 349 (8th Cir. 2012) ("As a federal court sitting in diversity jurisdiction, we apply the law that the forum state would apply." (quoting *Winthrop Res. Corp. v. Stanley Works*, 259 F.3d 901, 904 (8th Cir. 2001)). Therefore, Nebraska law on equitable estoppel and promissory estoppel applies. *See Immigr. L. Grp., LLP v. McKitrick*, 484 F.3d 998, 1001 (8th Cir. 2007) (applying Missouri law on equitable estoppel in a case brought in Missouri); *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1061 (8th Cir. 2005) (applying Missouri law on promissory estoppel in a case brought in Missouri).

In its Complaint, NFM alleges that "Guardsman is equitably estopped from arguing that the 2020 Trade Program Funds are not a rebate" because, in the Vendor Participation Agreement and the "Funding Program" document, Guardsman "agreed" and "confirmed" that there would be a five percent rebate. Filing 1 at 7. "Equitable estoppel is a bar which precludes a party from denying or asserting anything to the contrary of those matters established as the truth by his own deeds, acts, or representations." *Berrington Corp. v. State Dep't of Revenue*, 773, 765 N.W.2d 448,

16

455 (Neb. 2009). The Nebraska Supreme Court has outlined the requirements for a party to invoke equitable estoppel as follows:

> The elements of equitable estoppel are, as to the party estopped: (1) conduct which amounts to a false representation or concealment of material facts, or at least which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) the intention, or at least the expectation, that such conduct shall be acted upon by, or influence, the other party or other persons; and (3) knowledge, actual or constructive, of the real facts. As to the other party, the elements are: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the conduct or statements of the party to be estopped; and (3) action or inaction based thereon of such a character as to change the position or status of the party claiming the estoppel, to his or her injury, detriment, or prejudice.

*Id.* (internal footnote omitted).

The Court agrees with Guardsman that NFM has offered no evidence to support the application of equitable estoppel in this case to prevent Guardsman from arguing that the 2020 Trade Program funds are not an unconditional rebate. *See Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (stating that the moving party at summary judgment "can show that the nonmoving party does not have enough evidence of an essential element of its claim to carry its ultimate burden of persuasion at trial"). NFM essentially concedes this issue by declining to even address it in its briefing or cite any evidence to support its claim. *See Whittington v. Tyson Foods, Inc.*, 21 F.4th 997, 1002 n.4 (8th Cir. 2021) (holding that the plaintiff waived an argument he failed to raise in his brief support his cross-motion for summary judgment or in his brief opposing the defendant's summary judgment motion); *Paskert v. Kemna-ASA Auto Plaza, Inc.*, 950 F.3d 535, 540 (8th Cir. 2020) ("[T]he non-moving party is responsible for demonstrating any genuine dispute of material fact that would preclude summary judgment."). The fact that NFM wholly abandoned its burden on summary judgment is sufficient to find that summary judgment in Guardsman's favor is warranted.

NFM does not point to any evidence in the record that it relied, in good faith, upon Guardsman's conduct or statements. Indeed, both parties had a contractual relationship for twenty years in which NFM continually reinvested the Trade Program funds. Nothing in the record indicates that the mere reference of a 5% rebate in the Vendor Participation Agreement or the "Funding Program" document induced reliance on the part of NFM. Neither the Vendor Participation Agreement nor the Funding Program document even mentions the Trade Program. Indeed, although NFM argues that, in the Vendor Participation Agreement, Guardsman "agreed" that the Trade Program funds were a rebate that did not require reinvestment, it still reinvested the Trade Program funds in 2019, the same year in which the Vendor Participation Agreement was signed. Moreover, NFM has provided no explanation and cited no evidence showing that it acted to its detriment in response to Guardsman's conduct. The lack of evidence that NFM acted to its detriment is also fatal to its request to apply equitable estoppel. Accordingly, no reasonable jury could find that Guardsman is equitably estopped from denying that, under the Retailer Agreement, it must pay NFM a five percent rebate for 2020. *See Erickson*, 31 F.4th at 1048 ("[I]f a nonmoving party who has the burden of persuasion at trial does not present sufficient evidence as to any element of the cause of action, then summary judgment is appropriate." (quoting *Wagner v. Campbell*, 779 F.3d 761, 766 (8th Cir. 2015)).

Guardsman is also entitled to summary judgment on NFM's promissory estoppel claim. The Nebraska Supreme Court has explained:

> Recovery on a theory of promissory estoppel is based upon the principle that injustice can be avoided only by enforcement of a promise. Under the doctrine of promissory estoppel, a promise which the promisor should reasonably expect to induce action or forbearance is binding if injustice can be avoided only by enforcement of the promise . . . . Under this theory, the main focus is on reasonable reliance.

*In re Est. of Ryan*, 925 N.W.2d 336, 343 (Neb. 2019) (internal footnotes omitted). The elements for a claim of promissory estoppel are "(1) a promise that the promisor should have reasonably expected to induce the plaintiff's action or forbearance, (2) the promise did in fact induce the plaintiff's action or forbearance, and (3) injustice can only be avoided by enforcing the promise." *deNourie & Yost Homes, LLC v. Frost*, 854 N.W.2d 298, 318 (Neb. 2014).

NFM claims that "by executing the ["Funding Program" document], Guardsman promised that it would pay NFM a 5% rebate for the 2020 calendar year." Filing 1 at 8. Like its request to apply equitable estoppel, NFM fails to address this claim in its briefing. *See Whittington*, 21 F.4th at 1002 n.4. NFM has pointed to no evidence to support its claim for promissory estoppel. *See Paskert*, 950 F.3d at 540. For example, NFM has produced no evidence that Guardsman reasonably expected that NFM would act or refrain from acting in some way based on the "5% rebate" statement in the "Funding Program" document. *See Erickson*, 31 F.4th at 1048. Instead, the record shows that both parties had been engaged in an uninterrupted twenty-year contractual relationship prior to this suit. Filing 25 at 7. During that relationship, NFM had executed contracts with the same terms regarding the Trade Program for multiple years. Filing 26-4 at 2. There is no evidence that, after multiple years of operating the Trade Program as written, Guardsman would reasonably expect that NFM would believe any change to the Trade Program was occurring because of the "5% rebate" statement in the "Funding Program" document. It was NFM's burden on summary judgment to cite evidence in support of its promissory estoppel claim, and it has cited none. *See id.* Accordingly, Guardsman is entitled to summary judgment on NFM's promissory estoppel claim

## IV.  CONCLUSION

Guardsman is entitled to summary judgment on all of NFM's claims. Accordingly,

IT IS ORDERED:

1. Guardsman's Motion for Summary Judgment, Filing 24, is granted;

2. Nebraska Furniture Mart's Motion for Summary Judgment, Filing 27, is denied;

3. Nebraska Furniture Mart's Complaint, Filing 1, is dismissed with prejudiced; and

4. The Court will enter a separate judgment.

Dated this 22nd day of July, 2020.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge